**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**


**LEE ANNE SAVOIA-MCHUGH,**
**and JOHN SAVOIA-MCHUGH,**

      **Plaintiffs,**

**v.**                                                             **CASE NO. 3:19cv2018-MCR/HTC**

**MICHAEL S GLASS,**
**PHILIP KRISPIN,**
**EASTERN UNION FUNDING LLC,**
**WATERFALL LLC, WATERFALL**
**GROUP LLC, JOHN W MCCRARY,**
**and SANTA FE CAPITAL LLC,**

      **Defendants.**
_____/

## ORDER

Plaintiffs Lee Anne and John Savoia-McHugh ("Plaintiffs"), both Florida

citizens, have filed a 28-Count Amended Complaint, alleging they were the victims

of misrepresentations, omissions, and fraudulent inducement by Defendants Phillip

Krispin, Michael Glass, Waterfall Group, LLC ("Waterfall Group") (whose sole

member is Glass), and Eastern Union Funding, LLC ("Eastern Union"), causing

them to lose investment funds totaling more than $1,000,000. Plaintiffs allege that

Krispin and Glass's conduct also amounted to conversion and civil theft and that all

Defendants, including John McCrary and Santa Fe Capital, LLC ("Santa Fe")

(whose sole member is McCrary), formed a civil conspiracy to convert Plaintiffs' investment funds to the Defendants' benefit through a series of misrepresentations and omissions.[1] Two motions to dismiss the Amended Complaint are pending. Defendant Eastern Union moves to dismiss for failure to state a claim, ECF No. 47, and Defendants McCrary and Santa Fe move to dismiss for lack of personal jurisdiction, ECF No. 46.[2]  Having fully reviewed the matter, the Court finds that Eastern Union's motion is due to be granted in part and denied in part, and McCrary and Santa Fe must be dismissed for lack of personal jurisdiction.

## I.    Background

The Amended Complaint outlines the following.  Krispin, a real estate and investment advisor, employed as Senior Managing Director of Eastern Union, first contacted Plaintiffs in 2011 by telephone at their residence in Florida.  He offered them an opportunity to refinance an investment property the couple owned. Over a period of years, Krispin became a trusted advisor to Plaintiffs, recommending

---

[1] The allegations satisfy diversity jurisdiction.  *See* 28 U.S.C. § 1332(a).  Plaintiffs are Florida citizens, Krispin is a citizen of New Jersey, Glass and Waterfall Group are citizens of Pennsylvania, Eastern Union's members are New York citizens, and McCrary and Santa Fe are citizens of Texas.  It is alleged that Plaintiffs lost investment funds of well over $75,000.

[2] Krispin filed an Answer.  A Clerk's Default has been entered against Glass.  Defendant Waterfall Group has not responded to the Amended Complaint, but there is no proof of service of the Amended Complaint on the company.  Plaintiffs represented in a separate motion that Waterfall Group is apparently dissolved or defunct because their attempts to serve it were unsuccessful.  ECF No. 61, fn. 1.

various real estate investment opportunities for them.[3]  Plaintiffs allege that at all pertinent times, Krispin was acting within the course and scope of his actual or apparent agency with Eastern Union. He communicated with Plaintiffs by telephone at their residence in Florida and email communications sent to them in Florida, using his Eastern Union email account.

The Amended Complaint alleges the details of several real estate transactions for which Krispin allegedly solicited their investment funds through fraud and converted their funds to personal use.  In May 2016, Krispin allegedly solicited a $150,000 investment from Plaintiffs for a company called the Legacy Rose Group, LLC, for the purpose of purchasing a parcel of commercial real estate in California. Krispin provided a term sheet, which Plaintiffs allege fraudulently promised them a 10% annual return on the investment, to be distributed monthly over a 10-year period.  Plaintiffs received only partial and incomplete payments relative to their expected return and allege that since January 2018, Krispin has evaded their inquiries and refused to provide proof that Legacy Rose completed the purchase.  It is further alleged that Krispin in fact diverted their investment money to his own

---

[3] Plaintiffs allege Krispin was not licensed or registered with the Securities & Exchange Commission or the Financial Industry Regulatory Authority as an Investment Advisor or associated person of a Broker-Dealer.

personal company, Crimson Sail Group LLC, which he and his wife created on May 16, 2016, which was one day before receiving Plaintiffs' funds designated for the Legacy Rose Group.  *See* ECF No. 44-3.

In the Spring of 2016, Krispin also introduced the Plaintiffs to his colleague Michael Glass, and they sent Plaintiffs a proposal for five investment properties in in Alabama and Texas, two of which are at issue here.  This proposal sought a $100,000 investment for apartments in Houston called Avalon at Royal Oaks, and a $225,000 investment for another property in Houston called Hunters Chase (also known as Waterfall at Spring Branch), referenced as "the Waterfall investments." Also in August 2016, Krispin and Glass pursued Plaintiffs funds to invest in another opportunity, called Hammerly Oaks, an apartment property also in Houston.  Krispin and Glass represented to Plaintiffs that they would form an entity together named Waterfall Partners, LLC ("Waterfall Partners"), to hold the Waterfall investments and that they would be the only members.  Glass represented to Plaintiffs that he and Krispin were also working with McCrary and provided Plaintiffs his resume. Krispin and Glass touted McCrary's extensive knowledge, education, and experience in real estate investment work, and he was listed on a form biography

sheet for Waterfall Partners.[4]   Plaintiffs allege that after several rounds of discussions and revisions regarding the operating agreement, logo, and website biographies for Waterfall Partners, Krispin and Glass suddenly and without notice to Plaintiffs changed the entity's name to "Waterfall LLC," and Glass demanded that McCrary's real estate company, Santa Fe, be added as a member.[5]   Waterfall Properties, LLC, which was owned by Glass and a family member, was also added as a member.   Plaintiffs allege they were given proof of a 20% ownership interest in the entity of Waterfall, LLC, but no documented ownership in Waterfall Partners. They further allege that Krispin and Glass concealed that they were forming other "Waterfall" entities at the same time, in which Plaintiffs had no ownership interests, allegedly to create confusion about who owned interests in which entity.[6]

---

[4] In her declaration, Mrs. Savoia-McHugh produced a form biography sheet for Waterfall Partners, which Krispin and Glass had provided to Plaintiffs, showing McCrary as a CPA and attorney and stating McCrary would be in-house counsel and CFO of Waterfall Partners.  ECF No. 36-1, at 53-54.

[5] Plaintiffs and McCrary were both copied on emails while there were ongoing discussions to create the Waterfall Partners logo and draft the operating agreement.   McCrary filed a declaration in support of his Motion to Dismiss, in which he denies that he or Santa Fe had any ownership interest in Waterfall, LLC or Waterfall Group.  In response, Plaintiffs presented an *unsigned* operating agreement for "Waterfall LLC," which shows Plaintiffs' address as Pensacola, Florida, and states the percentage of each parties' ownership interest.

[6] The various company names created by Krispin and Glass without Plaintiffs' knowledge included Waterfall Partners; Waterfall Partners GP, LLC; Waterfall Group, LLC; and Waterfall Properties, LLC.

The Avalon at Royal Oaks project was to be the first investment.  Through multiple telephone conferences between Glass, Krispin and Plaintiffs during the spring and summer of 2016, Glass and Krispin assumed responsibility for Waterfall LLC's strategic vision and for obtaining financial backing, including researching property acquisitions, making recommendations for acquisitions, and creating strategies for securing financing.  On May 18, 2016, in reliance on Krispin and Glass's representations that Avalon Oaks was suitable, Plaintiffs delivered $100,000 to be held in escrow as the deposit on behalf of Waterfall Partners, despite not yet receiving documentation of their ownership interest in Waterfall Partners.  On June 6, 2016, Krispin represented that he was working with Deutsche Bank to obtain a portion of the financing and that Santa Fe would provide the remainder of the funding.  Plaintiffs allege that Krispin and Glass withheld from them that Santa Fe also was obligated to provide an additional $100,000 as earnest money but had failed to fulfill this obligation.[7]  The Avalon transaction failed to close—Plaintiffs were provided no explanation.  They allege that funding was never secured.  In late July 2016, their deposit was transferred to another escrow company for the Hunters Chase project.  The money could not be released without Mrs. Savoia-McHugh's signed

---

[7] Plaintiffs allege that the contract in fact had been negotiated by Glass and Santa Fe and that a $200,000 deposit was required.

authorization.  She provided emails showing that McCrary informed Glass on July 27, 2016, of the need for her signature, and Glass contacted Mrs. Savoia-McHugh.

Regarding the Hunters Chase transaction, Plaintiffs allege that on July 5, 2016, Krispin and Glass induced them to wire $25,000 to Eastern Union and to wire $200,000 for the Hunter's Chase deposit, on misrepresentations and omissions assuring them that Glass's relatives would "sponsor" the transaction, that Krispin was actively working to secure debt financing, that Plaintiffs would have a direct ownership interest, and that this was the extent of their investment.  Krispin and Glass allegedly concealed that the earnest money deposit would relieve McCrary of a "personal guaranty relating to the Hunters Chase project."[8]  Plaintiffs also allege that Krispin and Glass failed to disclose that the deposit was nonrefundable because the due diligence period expired on the day they made their payment.

Krispin and Glass also allegedly concealed from Plaintiffs Glass's financial troubles, which led to their inability to secure the necessary financing for the Hunter's Chase transaction.   Nonetheless, Krispin and Glass continued to

---

[8] No detail is provided as to this alleged personal guaranty.  However, it is alleged that the deposit was wired to Krispin and Glass's nominee "Nexus."  Mrs. McHugh provided an email in response to McCrary's Motion to Dismiss in which McCrary explained to her that the contract for Hunters Chase was in the name of Santa Fe and that a company named Nexus Capital Investments, LLC ("Nexus") had funded the earnest money but "expected to have its money replaced."  He said he understood that Mrs. Savoia-McHugh had provided that money.  ECF No. 36-1, at 62.

misrepresent to Plaintiffs the progress of the transaction, stating closing was imminent, requesting more money from Plaintiffs to extend the closing date, or soliciting more funds, purportedly to secure the financing.   Specifically, on September 2, 2016, Krispin and Glass falsely represented to Plaintiffs that the Hunter's Chase purchase was closing but an additional $25,000 was needed to secure funding from Deutsche Bank, which Plaintiffs paid in reliance on the representation. Krispin and Glass then requested another $100,000 to extend the closing date, which Plaintiffs were reluctant to provide. Partly based on the false representation that this payment would extend closing, Plaintiffs agreed to make a loan to Waterfall LLC in the amount of $650,000 on the condition that Glass and Krispin would be personal guarantors.  Plaintiffs wired the $650,000 to Chase Bank.

Instead of extending closing, and unbeknownst to Plaintiffs, on November 21, 2016, Glass, acting as "Authorized Agent of Santa Fe," caused Santa Fe to terminate the Hunters Chase investment, allowing all investments to that date ($900,000 funded solely by Plaintiffs) to be retained by the seller as liquidated damages.[9]  ECF No. 44, at 17-18.  Then in early December 2016, Krispin and Glass negotiated another purchase agreement with the seller, listing "Waterfall Group, LLC" as the

---

[9] There is no allegation that Glass actually was Santa Fe's authorized agent or that McCrary was aware of this.

buyer—an entity in which Plaintiffs have no ownership interest.  The new agreement required $50,000 in earnest money, and on December 8, 2016, again on misrepresentations and omissions of Krispin and Glass, Plaintiffs invested another $50,000.  From February through May 2017, Plaintiffs were informed by Krispin and Glass that they were personally working with Breton Equity, represented to be a funding source through Eastern Union, which was allegedly false.  And in further reliance on repeated assurances that the transaction was progressing toward closing, Plaintiffs continued to wire money—for instance, $10,000 on January 4, 2017, based on false representations by Krispin and Glass that it was needed to secure funding from Breton Equity for the Hunters Chase transaction (despite the fact that Plaintiffs had no ownership interest in the entity now named as buyer), and $15,000 on January 9, 2017, supposedly for loan origination and third-party reports.  The funding never came through.

During the same timeframe, Glass and Krispin were pursuing Plaintiffs to invest in yet another transaction—the Hammerly Oaks apartments in Houston.  In August 2016, at Krispin's request and in reliance on misrepresentations that Glass's family members would provide financing and Plaintiffs would have a direct ownership interest in the property for their investment, Plaintiffs wired $100,000 as earnest money to an escrow company.  In September 2016, Krispin and Glass used

an additional $200,000 of Plaintiffs' investment money for the earnest money deposit.  Krispin and Glass concealed from Plaintiffs that the deposit would become nonrefundable in only a few days, that Plaintiffs had no ownership interest in the buyer, that neither debt equity nor financing had been secured, and that the buyer would be paid a $250,000 acquisition fee at closing.[10]  Plaintiffs also allege that Krispin and Glass concealed that an additional $200,000 of prior earnest money deposits  "was actually made to relieve the personal debt obligations of McCrary and Glass as documented in a separate Nexus contract, likewise undisclosed to Plaintiffs, rather than fund the Plaintiffs' direct investment" in this project.[11]  Funding for Hammerly Oaks was never secured, and the seller allowed the money remaining on deposit to be applied to the Hunters Chase transaction, which was ongoing at the time.  In all, Plaintiffs allege they lost investment funds totaling $1,000,000.

To demonstrate that Krispin was acting as Eastern Union's agent and that Eastern Union was involved and aware of the transactions, Plaintiffs alleged that

---

[10] Plaintiffs do not allege the name of the buyer.

[11] No other details are provided about this alleged personal debt or Nexus in the Amended Complaint.  *See supra* Note 8.  The involvement or relevance of Nexus is unclear, except that Plaintiffs allege McCrary purchased his Santa Fe membership in a contract with Nexus that Krispin facilitated, that Krispin and Glass instructed Plaintiffs to wire money designated for the Hunters Chase transaction to Nexus, and that money they wired for the Hammerly Oaks project was actually used to pay a debt obligation of McCrary and Glass to Nexus.

Krispin used his Eastern Union email when communicating with Plaintiffs and sending them documents, including appraisals and reports from Eastern Union sent on August 10, 2016, signed with his title, "Senior Managing Director, Eastern Union Funding."  Also, Eastern Union's president, Ira Zlotowitz, sent an email to McCrary on August 15, 2016, thanking him for "the Hunters Chase Apartment deal that you're working on with Phil [Krispin]" and stating, "I'm looking forward to closing this with you and many more down the road!"  ECF No. 44, at 16.

Plaintiffs filed a 28-Count Amended Complaint, raising claims against Krispin, Eastern Union, and Glass individually, sounding in fraud, fraudulent and negligent misrepresentation, fraudulent inducement, negligence, and breach of fiduciary duty (Counts 1 to 18), conversion and civil theft against Krispin and Glass (Counts 19-22), and unjust enrichment and breach of promissory note against Krispin and Glass (Counts 23-24, 26).  The Amended Complaint also alleges in a separate count that Eastern Union is vicariously liable for the acts of its agent, Krispin, amounting to fraud, fraudulent and negligent misrepresentation, fraudulent inducement, negligence, breach of fiduciary duty, conversion, and civil theft (Count 25).  In addition, Plaintiffs request declaratory relief (Count 27) and allege a claim of civil conspiracy against all Defendants (Krispin, Glass, McCrary, Eastern Union, Waterfall Group, and Santa Fe Capital) to "convert for their own benefit the

Plaintiffs' substantial investment funds, and to do so via a series of misrepresentations, omissions and other improper and unlawful means" (Count 28).

## II.   Discussion

### A.   Failure to State a Claim:  Eastern Union

Eastern Union moves to dismiss the claims of common law fraud (Count 2), fraudulent misrepresentation  (Count 5), fraudulent inducement (Count 8), negligent misrepresentation (Count 11), negligence (Count 14), vicarious liability (Count 25), and civil conspiracy (Count 28) for failure to state a claim pursuant to Rule 12(b)(6). A motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of a complaint.  Federal pleading rules require a complaint to contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  *See* Fed. R. Civ. P. 8(a)(2).  While detailed allegations are not required, the facts alleged "must be enough to raise a right to relief above the speculative level," which requires "more than labels and legal conclusions" because "a formulaic recitation of the elements of a cause of action" will not suffice.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotations omitted).  To survive a motion to dismiss, the factual allegations in a complaint must state a claim that is "plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In considering whether the plaintiff has set forth a plausible claim, courts accept the

factual allegations in the complaint as true, *Erickson v. Pardus*, 551 U.S. 889, 94 (2007), and draw all reasonable inferences in the plaintiff's favor, *Randall v. Scott*, 610 F.3d 701, 705 (11th Cir. 2010). Bare legal conclusions lacking factual support, however, are not accepted as true. *See Mamani v. Berzain*, 654 F.3d 1148, 1153 (11th Cir. 2011); *Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1185 (11th Cir. 2003) (explaining that courts are not required to accept as true "conclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts").

Eastern Union argues that the counts sounding in fraud (Counts 2, 5, 8, and 11), fail to plead fraud with sufficient particularity. *See* Fed. R. Civ. P. 9(b).[12] Also, Eastern Union contends that the alleged misrepresentations amount to mere "puffing" under Florida law, which is not actionable and does not relieve a buyer of the duty to investigate the truth of those statements. *See Wasser v. Sasoni*, 652 So. 2d 411, 412 (Fla. 3d DCA 1995) (statements of opinion, *i.e.*, "a good building" or an "excellent deal" are mere puffing). The Court disagrees with both arguments.

---

[12] Rule 9(b) requires pleading the circumstances constituting fraud with particularity. Fed. R. Civ. P. 9(b). This requires allegations of the who, what, when, where, and how of the fraud. *Mizarro v. Home Depot, Inc.*, 544 F.3d 1230, 1237 (11th Cir. 2008). Rule 9(b) requires the complaint to state (1) precisely the statement or omission made, (2) the time and place of each statement or omission and who is responsible for it, (3) the content of the statement and how it misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud. *See Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001).

Despite the fact that the counts each incorporate *all* 102 factual paragraphs of the Amended Complaint, the factual transactions and alleged misrepresentations are intertwined in a series of misrepresentations and omissions that cannot be viewed in isolation.  "Rule 9(b) does not require a plaintiff to allege the time and content of every fraudulent statement in the event of a 'prolonged multi-act scheme,' or if the fraud took place over an extended time period." *Roche Diagnostics Corp. v. Priority Healthcare Corp*., No. 2:18-CV-01479-KOB, 2020 WL 2309874, at *19 (N.D. Ala. May 8, 2020) (quoting *U.S. ex rel. Clausen v. Laboratory Corp. of Amer., Inc*., 290 F.3d 1301, 1314 n. 25 (11th Cir. 2002)).  There are numerous references in the complaint to specific acts, misrepresentations, or omissions by Krispin, which are sufficiently particularized and therefore lend plausibility to the allegations, as detailed in Plaintiffs' response, *see* ECF No. 52, at 8-10.  Dates are provided for times when Krispin made various allegedly false representations to Plaintiffs about why and when certain payments were necessary (such as to extend closing dates or pay for reports) and details are alleged regarding assurances by Krispin that Plaintiffs would have an ownership interest in the buyer and that transactions were progressing and Krispin was working with various institutions to obtain financing, which were allegedly false. It is also alleged in detail that Krispin omitted material information, such as expiration dates for earnest money deposits or that Plaintiffs' investments

were at risk because due diligence dates were expiring, and induced them to continue sending money by falsely stating that deals were closing or additional money was needed to extend closing dates.  Moreover, these misrepresentations are not in the form of an "opinion" that can be characterized as mere puffing, but asserted factual matters.  *See Grimes v. Lottes*, 241 So. 3d 892, 896 (Fla. 2d DCA 2018) (determining "whether the representation is a fact or an opinion requires consideration of the surrounding circumstances," and a statement is treated as a fact if it "can be viewed as coming from one with superior knowledge of the subject").  Also, the Court agrees that Plaintiffs have adequately alleged justifiable reliance on the representations and/or omissions of Krispin because he was their financial advisor and was at all pertinent times allegedly working within the scope of his actual or apparent agency as Eastern Union's Senior Managing Director.[13]  As a result of the alleged fraud, the

---

[13] To state a claim for fraudulent inducement under Florida law, a party must allege a "(1) misrepresentation of a material fact, (2) by someone who knew or should have known of the statement's falsity, (3) with intent that the representation would induce another to rely and act on it, and (4) injury suffered in justifiable reliance on the representation." *Florida Evergreen Foliage v. E.I. Dupont Nemours & Co.*, 336 F. Supp. 2d 1239, 1284 (S.D. Fla. 2004); *see Butler v. Yusem,* 44 So.3d 102, 105 (Fla. 2010). "The requirements to establish negligent misrepresentation are similar to those required to establish fraudulent misrepresentation, with the exception that the knowledge element requires only that the representer either knew of the misrepresentation, made the misrepresentation without knowledge of its truth or falsity, or should have known the representation was false."  *Grimes*, 241 So. 2d at 896 (internal quotations omitted).  Also, "[a] defendant's knowing concealment or non-disclosure of a material fact may only support an action for fraud where there is a duty to disclose." *TransPetrol, Ltd. v. Radulovic*, 764 So.2d 878, 879-880 (Fla. 4th DCA 2000).

Plaintiffs lost a substantial amount of investment funds. The allegations are sufficiently particularized to satisfy Rule 9(b).

Eastern Union also argues that the vicarious liability claim of Count 25 must be dismissed as a mere theory of liability and that the claim fails to incorporate the elements of each independent cause of action to which the theory applies.[14] Actual or apparent agency are mere theories of vicarious liability, *see Villazon v. Prudential Health Care Plan, Inc*., 843 So. 2d 842, 851–52 (Fla. 2003) (stating "there are multiple different theories" for pursuing vicarious liability, including actual or apparent agency), and there is authority in Florida law stating that the claim of vicarious liability must be separately pled, *see Gen. Asphalt Co. v. Bob's Barricades, Inc*., 22 So. 3d 697, 699 (Fla. 3d DCA 2009) (citing *Goldschmidt v. Holman*, 571 So. 2d 422 (Fla.1990)). However, a careful reading of the Florida Supreme Court's opinion in *Goldschmidt* makes clear this requirement is inapplicable in cases, such as this, involving "corporate defendants who can commit torts only through their servants or agents" or where an employee/employer relationship is present. *Goldschmidt,* 571 So. 2d at 424 n.3 (noting no employment relationship was

---

[14] Count 25 alleges vicarious liability for Krispin's acts of fraud, fraudulent and negligent omissions, fraudulent inducement, breach of fiduciary duty, conversion, and civil theft in connection with Plaintiffs' investments, each of which is pled as a separate claim against Eastern Union as well.

alleged).   Additionally, the Eleventh Circuit has held that Florida's "heightened pleading" rule for vicarious liability does not apply in federal court.  *Palm Beach Golf Ctr.-Boca, Inc. v. John G. Sarris, D.D.S., P.A.*, 781 F.3d 1245, 1259-60 (11th Cir. 2015) (finding a district court erred in dismissing a vicarious liability conversion claim for the failure to satisfy Florida's "heightened pleading standard," stating federal courts apply federal pleading rules).   The claim thus appears to be unnecessary; it is also redundant to the substantive claims against Eastern Union, each of which also alleges that Eastern Union was acting through Krispin, its authorized agent.   Nonetheless, "motions to dismiss made under Rule 12(b)(6) only test the validity of the claim, not its redundancy; a redundant claim should not be dismissed as long as it is valid."  *Wichael v. Wal-Mart Stores, E., LP*, No. 6:14-cv-579-Orl-40DAB, 2014 WL 5502442, *2 (M.D. Fla. Oct. 30, 2014) (citing *Bangkok Crafts Corp. v. Capitolo Di San Pietro in Vaticano*, No. 03 Civ. 15(RWS), 2007 WL 1687044, at *10 (S.D.N.Y. June 11, 2007)).   The Court finds no reason to dismiss Count 25 at this time.

Eastern Union also argues that the negligence claim should be dismissed for the failure to state a claim.   The Court agrees.   Plaintiffs allege that Eastern Union was negligent in its "selection, retention, and supervision" of Krispin.   Negligent selection, or hiring, requires an allegation that the employer failed to make an

appropriate pre-employment investigation into the employee's background, which would have revealed the employee's unsuitability for the job, and that in light of this information, it was unreasonable for the employer to hire the employee. *Malicki v. Doe*, 814 So. 2d 347, 362 (Fla. 2002). A claim of negligent supervision or retention, on the other hand, focuses on whether the defendant had "reason to know of the tortious conduct and did nothing to prevent reasonably foreseeable harm from being inflicted upon the plaintiffs." *Id.* at 364. Liability for negligent supervision arises when the "employer knows or should know of an employee's unfitness and fail[ed] to take further action such as, such as investigating, discharge or reassignment." *Id.* at 362 n.15.

The Court agrees with Eastern Union that there are no facts alleged suggesting it knew or should have known of any reason not to hire Krispin or to select him for his position as Senior Managing Director. Plaintiffs do not argue otherwise. Plaintiffs argue instead that they have alleged certain "red flags" that Eastern Union knew or should have known about that, with reasonable supervision, could have been discovered. For instance, they have alleged that Krispin was directly involved in numerous real estate investments with clients (Plaintiffs), that Krispin had solicited a $650,000 loan from Plaintiffs, and that Plaintiffs lost substantial sums as a consequence of Krispin's misrepresentations and misconduct as Eastern Union's

agent.  The only allegation directly related to Eastern Union's knowledge is a letter from its president, which demonstrates an awareness of the transactions, but not any alleged wrongdoing.  The Court agrees with Eastern Union that the allegations do not state a claim.  Count 14 will be dismissed.

Finally, Eastern Union argues that the civil conspiracy claim of Count 28 should be dismissed for failure to state a claim against it.  The Court again agrees.  Count 28 alleges an "agreement or tacit agreement" in merely conclusory terms and blends the underlying torts of fraud and conversion (conversion is not alleged against Eastern Union) without factually identifying how Eastern Union agreed or conspired with its agent to divest Plaintiffs of investment funds.  Eastern Union should not have to guess from 102 factual allegations which ones in particular Plaintiffs contend implicate it in a civil conspiracy with its agent, Krispin.

## B.    Personal Jurisdiction:  McCrary and Santa Fe

McCrary and Santa Fe move for dismissal, arguing that personal jurisdiction is lacking.  *See* Fed. R. Civ. P. 12(b)(2).  Federal courts exercise personal jurisdiction over nonresident defendants to the same extent as Florida courts, provided the exercise of jurisdiction is consistent with due process.  *Licciardello v. Lovelady*, 544 F.3d 1280, 1283 (11th Cir. 2008).  A plaintiff bears the burden to establish "a *prima facie* case of personal jurisdiction over a nonresident defendant," *Meier ex rel. Meier*

*v. Sun Int'l Hotels, Ltd.,* 288 F.3d 1264, 1268–69 (11th Cir. 2002), and where, as here, no evidentiary hearing is requested or held, the Court accepts the well-pled facts as true to the extent they are uncontroverted by affidavits or deposition testimony.  *See Morris v. SSE, Inc.*, 843 F.2d 489, 492 (11th Cir. 1988).  If "the defendant submits affidavits to the contrary, the burden traditionally shifts back to the plaintiff to produce evidence supporting jurisdiction."  *Meier,* 288 F.3d at 1269. If the affidavits conflict, "the court must construe all reasonable inferences in favor of the plaintiff."[15]  *Id.*; *see also Delong Equip. Co. v. Washington Mills Abrasive Co.*, 840 F.2d 843, 845 (11th Cir. 1988) (noting the court gives "greater weight" to the plaintiff in the "battle of affidavits" at the motion to dismiss stage, "particularly when 'the jurisdictional questions are apparently intertwined with the merits of the case.'").

Federal courts conduct a two-step inquiry when considering personal jurisdiction:  (1) whether personal jurisdiction is adequately alleged under the forum state's long-arm statute and (2) whether the exercise of jurisdiction comports with the requirements of due process.  *See PVC Windoors, Inc. v. Babbitbay Beach*

---

[15] The decision to hold an evidentiary hearing on a motion to dismiss for lack of personal jurisdiction is discretionary.  *Cable/Home Commc'n Corp. v. Network Prods., Inc.*, 902 F.2d 829, 855 (11th Cir. 1990).  The Court concludes that the affidavits do not so conflict on a jurisdictional fact as to require a hearing.

*Const., N.V.*, 598 F.3d 802, 807 (11th Cir. 2010); *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1274 (11th Cir. 2009). Florida's long-arm statute authorizes courts to exercise jurisdiction over a nonresident based on either specific or general jurisdiction. *See* Fla. Stat. § 48.193(1), (2). General jurisdiction exists over a defendant engaged in "substantial and not isolated activity" within Florida, regardless of whether the claim arises from that activity. Fla. Stat. § 48.193(2). Specific jurisdiction is satisfied when the cause of action arises out of an enumerated specific act within Florida or directed at Florida residents or property within the state, such as, in relevant part, the commission of a tortious act within the state by a person or his agent. *See* Fla. Stat. § 48.193(1)(a)(2). In this case, Plaintiffs invoke the tortious act prong of the long-arm statute as the basis for specific jurisdiction over McCrary and Santa Fe, alleging that they were members of a civil conspiracy that targeted Plaintiffs in Florida.[16] *See* Fla. Stat. § 48.193(1)(a)(2).

The "threshold inquiry" under the tortious act prong of the long-arm statute is whether "the allegations of the complaint state a cause of action." *PVC Windoors,* 598 F.3d at 808 (quoting *Wendt v. Horowitz,* 822 So. 2d 1252, 1260 (Fla. 2002)). If

---

[16] Plaintiffs concede they are not asserting general jurisdiction. There are no factual allegations that McCrary and Santa Fe ever did business in Florida, and Plaintiffs do not argue that they did. *See* ECF No. 51 at 8 n.2 (conceding Plaintiffs are not attempting to establish general jurisdiction).

so, the court determines whether the alleged cause of action arises from tortious conduct within the state or a communication from outside of the state that targeted a state resident. *See Wendt*, 822 So. 2d at 1260. Physical presence is not necessary; the commission of a tortious act in Florida "can occur through [a] nonresident defendant's telephonic, electronic, or written communications into Florida," as long as the cause of action arises from the communications. *See Wendt*, 822 So. 2d at 1260; *see also LaFreniere v. Craig-Myers*, 264 So. 3d 232, 238 (Fla. 1st DCA 2018) (physical presence is not required to commit a tort within Florida if the tortious act "involved communication directed into Florida for the purpose of committing a fraud, slander, or some other intentional tort"). Where a conspiracy to commit a tortious act against the plaintiff in Florida and an act in furtherance of it by any conspirator are successfully alleged, then all conspirators are subject to Florida's long-arm jurisdiction. *See Execu-'Tech Bus. Sys v. New Oji Paper Co.*, 752 So. 2d 582, 585 (Fla. 2000); *Wilcox v. Stout*, 637 So. 2d 335, 337 (Fla. 2d DCA 1994); *see also Mazer*, 556 F.3d at 1281 (Florida's "long-arm statute can support personal jurisdiction over any alleged conspirator where any other co-conspirator commits an act in Florida in furtherance of the conspiracy, even if the defendant over whom personal jurisdiction is sought individually committed no act in, or had no relevant contact with, Florida").

CASE NO. 3:19cv2018-MCR/HTC

Courts will not apply the coconspirator theory of jurisdiction, however, "if the plaintiff fails to plead with specificity any facts supporting the existence of the conspiracy and provides nothing more than vague and conclusory allegations regarding a conspiracy involving the defendants." *NHB Advisors, Inc. v. Czyzyk*, 95 So. 3d 444, 448 (Fla. 4th DCA 2012); *see* Fed. R. Civ. P. 9(b) (pleading fraud with particularity).  Pleading a civil conspiracy under Florida law requires allegations of "(a) an agreement between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts done under the conspiracy." *Mazer*, 556 F.3d at 1271 (quoting *Charles v. Fla. Foreclosure Placement Ctr., LLC*, 988 So. 2d 1157, 1159–60 (Fla. 3d DCA 2008)).  "Each coconspirator need not act to further a conspiracy; each 'need only know of the scheme and assist in it in some way to be held responsible for all of the acts of his coconspirators.'" *Charles*, 988 So. 2d at 1160 (quoting *Donofrio v. Matassini*, 503 So. 2d 1278, 1281 (Fla. 2d DCA 1987)).  "The existence of a conspiracy and each individual's participation in it may be inferred from circumstantial evidence." *Donofrio*, 503 So. 2d at 1281 (defendant must know of the conspiracy and assist in some way); *see also Am. Fed'n of Labor and Congress of Indus. Orgs. v. City of Miami, FL,* 637 F.3d 1178, 1192 (11th Cir. 2011) (an agreement may be inferred

"from the relationship of the parties, their overt acts and concert of action, and the totality of their conduct").  But, if the complaint does not allege viable facts from which it could be reasonably inferred that the defendant "was part of a conspiracy either engineered in Florida or pursuant to which a tortious act in furtherance was committed in Florida," then the defendant is "not subject to conspiracy-imputed personal jurisdiction under Florida's long-arm statute."  *Mazer*, 556 F.3d at 1283.

Civil conspiracy (Count 28) is the only claim against McCrary and Santa Fe, and therefore, the determinative questions are whether there is a plausible allegation of a conspiracy and whether McCrary and Santa Fe are plausibly alleged to have been members of that conspiracy.  Because the underlying tort is based in part on misrepresentations and concealment, sounding in fraud, the conspiracy must be alleged with particularity.  *See* Fed. R. Civ. P. 9(b); *see also Am. United Life Ins. Co. v. Martinez*, 480 F.3d 1043, 1067–68 (11th Cir. 2007) (finding a civil conspiracy claim failed to comport with Rule 9(b) standards, which requires specificity).  The Court finds that, while the Amended Complaint may adequately allege a conspiracy between Krispin and Glass, the allegations relating to McCrary and Santa Fe are too vague and conclusory to impute personal jurisdiction on the basis of membership in the conspiracy.

In Count 28, the elements of civil conspiracy are alleged in a merely conclusory manner. Plaintiffs assert there was an "express or tacit agreement" between the Defendants to obtain or convert Plaintiffs' investment funds for their own benefit "via a series of misrepresentations, omissions, and other unlawful means," and that each Defendant engaged in "numerous acts in furtherance of the conspiracy." ECF No. 44, at 43. Plaintiffs incorporate *all* 102 factual paragraphs into Count 28 but fail to identify which allegations permit an inference of an agreement, which demonstrate that McCrary and Santa Fe were aware of a conspiracy, and which show that they willfully joined it. None of the alleged misrepresentations, omissions, or acts of concealment alleged in the Amended Complaint are specifically attributed to McCrary or Santa Fe, and neither fraud nor conversion is expressly alleged against them as a substantive count.[17]

At most, it is alleged that McCrary and Santa Fe were involved in discussions about creating Waterfall Partners; that they were participants in the Avalon and Hunters Chase transactions in some capacity; that McCrary was aware Plaintiffs were investors; and that a debt obligation of McCrary was relieved, at least in part,

---

[17] While Mrs. Savoia-McHugh adds McCrary's name in her declaration when she makes statements such as, "Krispin, Glass and McCrary" concealed facts from Plaintiffs, these statements in her declaration are likewise conclusory and provide no added factual content to show that such a claim could be plausibly alleged against McCrary.

by investment funds that Plaintiffs provided for the Hunters Chase and Hammerly Oaks transactions (which ultimately were not consummated due to lack of financing).[18] McCrary's involvement in the transactions and his alleged benefit from them do not give rise to a reasonable inference that he joined a conspiracy, because there is no factual allegation to indicate he was aware of the alleged wrongdoing. The allegation that he contacted Glass to obtain Mrs. Savoia-McHugh's signature to transfer the investment money from one escrow company (designated for the Avalon project, which fell through) to another escrow account (to be applied to the Hunters Chase project, which also fell through), similarly does not evidence knowledge that Krispin and Glass fraudulently induced the investment from Plaintiffs or that they were targeting Florida to steal their investment money.[19]  Allegations that McCrary and Santa Fe were involved in the same business dealings as Plaintiffs, Krispin and Glass, and benefitted from transactions in which Plaintiffs suffered a financial disadvantage, are simply not sufficient to show that McCrary knew of and joined in

---

[18] The details of these transactions and various debt obligations are not entirely clear from the Amended Complaint, and although Plaintiffs allege that McCrary purchased Santa Fe from Nexus, and Krispin somehow facilitated that transaction, the significance of this is left to speculation.

[19] There is no indication that McCrary even knew Plaintiffs were Florida citizens.  The emails do not reference where Plaintiffs lived, their address was listed only on an unsigned operating agreement, and there is no allegation that McCrary emailed them or called them by telephone until over a year later after Mrs. Savoia-McHugh called him.

the alleged fraud or conversion. "Indeed, an allegation of parallel conduct and a bare assertion of conspiracy will not suffice. Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." *Honig v. Kornfeld*, 339 F. Supp. 3d 1323, 1345 (S.D. Fla. 2018) (internal quotations omitted). A civil conspiracy may be inferred from circumstantial evidence but not from mere speculation.[20] *See id.* at 1345-46 (quoting circumstantial evidence is proof of conspiracy "only when the inference sought to be created by such circumstantial evidence outweighs all reasonable inferences to the contrary") (quoting *Raimi v. Furlong,* 702 So. 2d 1273, 1284 (Fla. 3d DCA 1997)); *see also Iqbal*, 556 U.S. at 678 (stating "[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief").

Because Count 28 fails to state a claim against McCrary and Santa Fe, there is no *prima facie* basis for personal jurisdiction, *see Meier,* 288 F.3d at 1268–69

---

[20] Plaintiffs argue that McCrary and Santa Fe did not challenge the sufficiency of the conspiracy allegations. This argument is disingenuous. The motion itself is based on personal jurisdiction and acknowledges the existence of imputed personal jurisdiction for coconspirators but argues Plaintiffs failed to meet their burden to establish McCrary and Santa Fe were members of a conspiracy. McCrary and Santa Fe argue expressly that the allegations of the complaint and also Mrs. Savoia-McHugh's declaration are insufficient. *See* ECF No. 46, at 8-10.

(stating it is the plaintiff's burden to establish "a *prima facie* case of personal jurisdiction over a nonresident defendant"), and consequently, there is no need to consider McCrary's declaration or Mrs. Savoia-McHugh's responsive declaration to decide personal jurisdiction.  Considering them, however, does not change the result. McCrary denied having any contacts with Florida, denied any ownership interest in Waterfall LLC or Waterfall Group, denied that he or Santa Fe received any funds from Plaintiffs, and denied any contact with Plaintiffs prior to 2017, when Mrs. Savoia-McHugh contacted him with questions, long after the events complained of in the Amended Complaint. Mrs. Savoia-McHugh's declaration makes conclusory assertions, such as that "McCrary and Santa Fe were directly involved and actively participated in multiple acts and omissions in furtherance of the civil conspiracy alleged;" that McCrary "worked to facilitate negotiations and agreements" in connection with the Avalon, Hunters Chase, and Hammerly Oaks transactions; that he "stood to benefit financially when the purchases closed" (but they did not close); and that McCrary, Krispin, and Glass "concealed" that Plaintiffs' funds were used to relieve McCrary of a personal debt obligation.  Her declaration does not show any Florida contacts by McCrary or provide facts that would allow a reasonable inference that he was aware of Krispin and Glass's alleged misconduct, nor does it show that McCrary owed her a duty of disclosure or that Plaintiffs could adequately

amend the allegations with anything more than speculation.  Thus, Florida's long-arm statute is not satisfied, and for the same reasons, the more stringent due process minimal contacts inquiry also is not satisfied.[21]  The motion will be granted.

Accordingly:

1.      Eastern Union Funding LLC's Motion to Dismiss for Failure to State a Claim, ECF No. 47, is **GRANTED in part** as to Count 14 and Count 28, which are **DISMISSED** as against Eastern Union, and in all other respects, the motion is **DENIED**.  Eastern Union has fourteen (14) days to file an Answer.

2.      McCrary and Sant Fe's First Amended and Restated Motion to Dismiss Complaint for Lack of Personal Jurisdiction, ECF No. 46, is **GRANTED**.  Count 28 against McCrary and Santa Fe is **DISMISSED** for lack of personal jurisdiction.

---

[21] As the Florida Supreme Court has recognized, Florida's long-arm jurisdiction is broad, and "the federal due process analysis is not built into" it automatically.  *Internet Sols. Corp. v. Marshall*, 39 So. 3d 1201, 1207 (Fla. 2010).  While a plausible intentional tort targeting a Florida resident may show the defendant had fair warning that he could be haled into court because "states have a special interest in exercising jurisdiction over those who commit intentional torts causing injury to their residents," *Licciardello*, 544 F.3d at 1284-85 (citing *Calder v. Jones*, 465 U.S. 783, 790 (1984)), the Supreme Court has more recently clarified the minimum contacts inquiry as requiring more than contact with the plaintiff: "The proper focus of the 'minimum contacts' inquiry in intentional-tort cases is 'the relationship among the defendant, the forum, and the litigation,'" not the defendant and the plaintiff.  *Walden v. Fiore*, 571 U.S. 277, 291 (2014) (quoting *Calder*, 465 U.S. at 788) (defendant, not plaintiff or third parties, must create the requisite contact with the forum). Thus, even assuming a conspiracy targeting these Plaintiffs is alleged, McCrary and Santa Fe are not plausibly alleged to be members of it nor do they have the requisite minimum contacts with Florida to satisfy due process.

CASE NO. 3:19cv2018-MCR/HTC

3.      Pursuant to a prior Order extending deadlines, ECF No. 62, the discovery deadline is 60 days after the close of pleadings, which will be the date of Eastern Union's Answer.

**DONE AND ORDERED** this 5th day of August 2020.


*M. Casey Rodgers*
**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**